## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

The Trustees of the Minnesota Cement Masons
and Plasterers Fringe Benefit Funds,

                               Plaintiffs,

                                            Civ. No. 07-3973 (RHK/RLE)
                                            **MEMORANDUM OPINION
                                            AND ORDER**

v.

Letourneau & Sons, Inc., a Minnesota corporation,
and John E. Letourneau, Jr.,

                               Defendants.

Stephen C. Kelly, Rosene, Haugrud & Staab, Chartered, St. Paul, Minnesota, for
Plaintiffs.

Kenneth A. Kimber, Hanft Pride, PA, Duluth, Minnesota, for Defendants.

      In this ERISA case, Defendants Letourneau & Sons, Inc. ("Letourneau & Sons")

and John E. Letourneau, Jr., have filed a Motion to Enforce a purported settlement

between the parties (Doc. No. 22). For the reasons set forth below, the Court will deny

the Motion.

## BACKGROUND

      Plaintiffs are the trustees of several union fringe-benefit funds. In May 2005,

Letourneau & Sons signed a written agreement (the "Agreement") pursuant to which it

agreed to make monthly contributions to the funds for work performed by its unionized

employees. Plaintiffs allege that, pursuant to the terms of the Agreement, Letourneau

agreed to joint and several liability for any fringe-benefit fund contributions owed by Letourneau & Sons.

Letourneau & Sons failed to make the required fund contributions for several months in 2007.  Plaintiffs then commenced the instant action, seeking a judgment against both Letourneau & Sons and Letourneau for the amount of the past-due contributions, as well as liquidated damages, attorneys' fees, and costs.

The instant Motion arises out of settlement discussions between Defendants' counsel, Kenneth Kimber, and Plaintiffs' counsel, Stephen Kelly, via e-mail between June 11 and June 17, 2008.  On June 11, Kimber e-mailed Kelly and informed him that based on the calculations of an independent auditor, the delinquent contributions totaled $18,368.28; Kimber offered a confession of judgment in that amount against Letourneau & Sons, but not Letourneau, to settle the case.  (Kelly Aff. Ex. A.)  Kelly responded later that day by asking Kimber if the proposed settlement would involve only a confession of judgment – in other words, whether any payment would be made.  (Id. Ex. D.)  Kimber responded almost immediately, stating "[t]here will not be a payment of money. Letourneau and Sons, Inc. has no money from which to pay any settlement or judgment. The company has no assets."  (Id. Ex. E.)  Kelly then advised Kimber that he would present the offer to Plaintiffs but that he "would not expect a settlement."  (Id. Ex. F.)

By June 16, 2008, Kimber had not heard back regarding the settlement offer. Accordingly, he e-mailed Kelly and asked him to postpone the deposition of Letourneau, then scheduled for June 19, 2008, in light of the parties' settlement discussions.  (Id. Ex.

CASE 0:07-cv-03973-RHK-RLE   Document 38   Filed 09/02/08   Page 3 of 8


H.)  Kelly responded one hour later, informing Kimber that Plaintiffs had rejected the settlement offer and that the deposition would go forward as scheduled.  (<u>Id.</u> Ex. I.)  Of particular note, Kelly stated, "we could talk about setting the matter on for a settlement conference[,] but if your client isn't willing to pay anything, there probably isn't much usefulness in that."  (<u>Id.</u>)

The following morning, June 17, 2008, Kimber responded to Kelly's e-mail, asking for a counteroffer.  (<u>Id.</u> Ex. J.)  He advised Kelly that Letourneau & Sons was willing to confess judgment – "the same result [as] if you went to trial" – but that a settlement involving payment would not be possible because the company and Letourneau both lacked any assets with which to pay.  (<u>Id.</u>)  Kelly responded approximately fifteen minutes later with the following e-mail, which is the crux of the instant Motion:

> Ken,
>
> As long as its just the Company confessing judgment, my client's offer is the audit amount plus costs.  If Mr. Letourneau confessed judgment along with the Company, I'd maybe be able to give you a lower number.

(<u>Id.</u> Ex. K.)  In response, Kimber asked Kelly the amount of Plaintiffs' costs, and Kelly informed Kimber that he would calculate that number and get back to him.  (<u>Id.</u> Ex. L.)

At 3:01 p.m. on June 17, 2008, Kelly e-mailed Kimber a breakdown of the delinquent fringe-benefit fund contributions, liquidated damages, attorneys' fees, and costs; the grand total was $29,287.68.  (<u>Id.</u> Ex. P.)  The breakdown appeared under a

-3-

heading that stated "Rule 408 Offer to Compromise." (<u>Id.</u>)  Kimber responded at 3:38

p.m.:

> I've had a chance to speak with my client on this.
>
> Based on your e-mails, Letourneau & Sons, Inc. accepts your Offer of Compromise and agrees to enter into a Confession of Judgment in the amount of $29,287.68.
>
> In conjunction with the acceptance of the Offer of Compromise by Letourneau & Sons, Inc., your clients will dismiss their claims against John Letourneau, Jr., individually, with prejudice.  I will prepare the Confession of Judgment, put together a Release (for the claims against Mr. Letourneau individually), and prepare a Stipulation of Dismissal with Prejudice (and accompanying Order) for the claims against John E. Letourneau, Jr.  The deposition currently scheduled for June 19 will also now be cancelled.

(<u>Id.</u> Ex. Q.)  Twelve minutes later, at 3:50 p.m., Kelly e-mailed Kimber and stated

"[t]here is no agreement.  My client does not accept an offer which in any way dismisses

John E. Letourneau, Jr., individually.  The deposition is not cancelled." (<u>Id.</u> Ex. R.)

Kelly followed up with another e-mail 25 minutes later, apologizing for any confusion:

> I am sorry if I was not clear.  My client is looking to get paid.  Unless the resolution involves a payment, payment plan or confession of judgment by both the Company and Mr. Letourneau, there will be no settlement.  There is no agreement here and this matter looks to be resolved either by motion or trial.  I expect to see you and your client on Thursday for the deposition.

(<u>Id.</u> Ex. S.)  Kimber, however, insisted that an agreement had been reached, and he e-

mailed Kelly shortly thereafter and informed him that he intended to hold Kelly to that

agreement and that Letourneau would not be appearing at the scheduled deposition.  (Id.

Ex. T.)  When Kelly later bristled at Kimber's assertion, this Motion followed.[1]

## ANALYSIS

"A settlement agreement is essentially a contract, subject to contractual rules of

interpretation and enforcement."  Goddard, Inc. v. Henry's Foods, Inc., 291 F. Supp. 2d

1021, 1028 n.3 (D. Minn. 2003) (Erickson, M.J.); accord Sheng v. Starkey Labs., Inc., 53

F.3d 192, 194 (8th Cir. 1995) ("Settlement agreements are governed by basic principles

of contract law.").  Although this is an ERISA case, the enforceability of the alleged

settlement agreement is determined in accordance with Minnesota law.  See, e.g.,

Goddard, 291 F. Supp. 2d at 1028 n.3; Health & Welfare Plan for Employees of REM,

Inc. v. Ridler, 942 F. Supp. 431, 434 n.3 (D. Minn. 1996) (Kyle, J.) ("a settlement

agreement does not 'arise under' . . . ERISA . . . , and its enforceability would appear to

be a question of state law").[2]

Here, Defendants argue that as a result of the e-mail exchange discussed above, the

parties reached an agreement to settle this case.  Under Minnesota law, a settlement

agreement arises when there is acceptance of an offer that encompasses all of the essential

terms of the parties' settlement.  Ryan v. Ryan, 193 N.W.2d 295, 297 (Minn. 1971).

Plaintiffs contend that no such agreement exists here because several material terms were

---

[1] The parties have agreed that a hearing is unnecessary and that the Motion is ripe for resolution upon the written record.  (See Doc. No. 37.)

[2] There is no dispute that the Court is empowered to enforce the settlement agreement, assuming it is binding and valid.  See, e.g., Barry v. Barry, 172 F.3d 1011, 1013 (8th Cir. 1999).

omitted from the "offer," namely, "payment of the amount owed [and] Co-Defendant

John E. Letourneau, Jr.'s dismissal." (Mem. in Opp'n at 12.)[3]   The Court need not delve

into this argument, because assuming *arguendo* the existence of a binding settlement

agreement, it was validly rescinded a mere 12 minutes after its formation.

It has been the law in Minnesota for more than 100 years that a unilateral mistake

in making a contract is a valid basis for rescission if the mistaken party "acts promptly

and the contract can be rescinded without prejudice to the other party; that is, if both

parties can be placed in statu quo.  This is on the ground that the parties did not have the

same subject-matter in mind in making the contract, and did not in fact come to an

agreement in respect to the same thing."  Olson v. Shepard, 206 N.W. 711, 712 (Minn.

1926); accord, e.g., Benson v. Markoe, 33 N.W. 38, 42 (Minn. 1887); A.A. Metcalf

Moving & Storage Co. v. N. St. Paul-Maplewood-Oakdale Sch., 587 N.W.2d 311, 318

(Minn. Ct. App. 1998) ("a unilateral mistake in entering a contract is not a basis for

rescission unless there is ambiguity, fraud, misrepresentation, *or where the contract may*

*be rescinded without prejudice to the other party*") (emphasis added) (citation omitted).

Assuming that an agreement to settle arose out of the exchange of e-mails between Kelly

and Kimber, that agreement was clearly predicated on Kelly's unilateral mistake:  his

---

[3] Plaintiffs also appear to argue that a valid contract cannot be formed through an exchange of e-mails between counsel. (See Mem. in Opp'n at 11-12 ("In the present case the parties were not at a settlement conference, or in mediation but the parties' legal counsel were communicating by email.  The case cited by Defendants all involve something more than an email exchange.").)  Notwithstanding the sometimes informal nature of e-mails, the Court perceives no reason why they should be treated any differently than letters or other types of written communications.

failure to specify that *payment* would be necessary in order to resolve the matter in its entirety (that is, with Letourneau included).  There can be little question that this is precisely what Kelly had in mind.  Indeed, Kelly told Kimber on June 11 that Defendants' initial offer, which did not involve any type of payment, was likely to be rejected, and Kelly reiterated that fact to Kimber on June 17 (one day before he sent the fatal e-mail), noting that "if your client isn't willing to pay anything, there probably isn't much usefulness" in discussing settlement.  (Kelly Aff. Ex. I (emphasis added).)  The final offer drove this point home, as it clearly indicated that Plaintiffs were willing to settle on two different sets of terms, depending upon whether Letourneau was included in a confession of judgment or not.  (Id. Ex. K.)[4]

Furthermore, when Kimber informed Kelly that Defendants had accepted Plaintiffs' offer, Kelly responded almost immediately and stated that there was no agreement.  Defendants cannot possibly have been prejudiced by Kelly's actions a mere twelve minutes after the birth of the alleged settlement, and Defendants do not argue otherwise.  If the parties to this lawsuit had been negotiating face to face and had seemingly reached an agreement, only to have Plaintiffs minutes later hesitate and change their position, no reasonable person would force Plaintiffs to uphold their end of the

---

[4] Given that Plaintiffs apparently were uninterested in settling this case without receiving some type of payment (or without including Letourneau in a confession of judgment), it could be argued that Kelly lacked authority to settle under the terms of his e-mailed offer.  Under those circumstances, no binding settlement agreement can have arisen.  See, e.g., Aetna Life & Cas. v. Anderson, 310 N.W.2d 91, 95 (Minn. 1981) ("an attorney has no authority, in the absence of an emergency, to settle and compromise a cause of action without the knowledge or consent of his client").  Because Plaintiffs did not raise this argument, however, the Court will not address it.

"bargain."  The fact that the parties' negotiations occurred by e-mail should not change that result.  See Jacobs v. Farmland Mut. Ins. Co., 377 N.W.2d 441, 444 (Minn. 1985) ("Equity will set aside a release and settlement if improvident or unconscionable and will prevent one party from taking an unconscionable advantage of another's mistake.").

For these reasons, Kelly's unilateral mistake provides a basis for rescinding the settlement agreement, assuming that it ever existed.  Defendant's Motion to Enforce the purported settlement, therefore, must be denied.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion to Enforce Settlement (Doc. No. 22) is **DENIED**. The parties are directed to contact Magistrate Judge Erickson to discuss any remaining pre-trial issues (outstanding discovery, motion deadlines, etc.) and the possibility of a settlement conference with Judge Erickson.

Dated: September 2, 2008                          s/Richard H. Kyle
                                                  RICHARD H. KYLE
                                                  United States District Judge